**AUTOMOBILE INS. CO. OF HARTFORD, CONN., et al.**

v.

**UNITED FRUIT CO.**

United States District Court
S. D. New York.
June 29, 1954.

Bigham, Englar, Jones & Houston, New York City, for libelants (Henry N. Longley, New York City, William F. Andersen, Pelham, N. Y., of counsel).

Burlingham, Hupper & Kennedy, New York City, for respondent (Burton H. White, Robert A. Feltner, Gerard Harrington, Jr., New York City, of counsel).

MURPHY, District Judge.

This consolidated cause involving claims for damage to cargo caused by fire on board a vessel, having been tried to the court, the following are made

### Findings of Fact.

1. At all times herein mentioned libelants were cargo owners and underwriters insuring cargo damaged by fire on board the motor vessel Shell Bar while en route from New York to Havana and Central American ports in May, 1948. Libelants are various corporations and co-partnerships, some domiciled in New York, others elsewhere; some having offices for transaction of business in this judicial district, and others having such offices elsewhere.

2. At all such times, respondent, a New Jersey corporation with office and place of business within this judicial district, was chartered owner in possession of the M/V Shell Bar, which it operated as a merchant vessel in common carriage of merchandise for hire between the port of New York and other ports.

3. In the latter part of April, 1948, certain shippers delivered shipments which are the subject of this action to respondent as a common carrier at the port of New York for transportation to various other ports and delivery to certain consignees. Respondent accepted at New York such shipments and issued to such shippers its bills of lading therefor, agreeing to transport and deliver these shipments in consideration of freights paid or agreed to be paid according to the terms of the bills of lading. These shipments were loaded on board the M/V Shell Bar.

4. The M/V Shell Bar, a C–1 MAVI type vessel, of 3,805 gross tons, diesel propelled, with engines and one cargo compartment aft and three cargo compartments forward, and cargo space ventilated by electric blower fans, sailed from New York at 4:01 P.M., May 1, 1948, bound for Havana. Outside air temperatures ranged from 50–65 degrees F. the first day, 48–66 degrees F. on May 2, and 78 degrees F. in the morning of May 3, prior to the fire. Until midnight of May 2, the winds ranged from calm to force 3, and thereafter until time of the fire, from force 5 to 6. At 5:43 A.M. on May 3, a fire in No. 1 and No. 2 holds was indicated by automatic smoke devices as well as by observation of flames and black smoke from ventilators in the forward mast house leading from the

No. 1 and No. 2 holds. These ventilators were closed and the fire fought principally with $CO_2$ and also with water in the two holds. The No. 2 hatch with heavy steel pontoons and covered by three battened down tarpaulins, then blew up. The vessel changed its course to put into Norfolk where the fire was ultimately extinguished.

5. Compartment damage occurred in the after end of No. 1 upper 'tweendeck and the forward end of No. 2 upper 'tweendeck holds, with structural damage of plate buckling in both compartments.

6. Cargo in No. 1 upper 'tweendeck compartment included 100 drums of bleaching powder that were stowed a few feet aft of the hatch coaming on the starboard side, running inboard about a dozen feet, three rows deep and three tiers high. The drums were stowed on wooden dunnage and against wooden cargo battens on the starboard side of the compartment. Other cargo in this compartment comprised wooden cases containing motors against the bulkhead across the vessel, one case wide and about three feet high, and on top of these cases, 1,200 paper bags of talc extending forward to the drums of bleaching powder. Additional items stowed in the vicinity of the drums included quantities of shellac in burlap bags and baled piece goods of cotton or jute covered with paper.

7. Each of the 100 drums of steel had affixed a yellow label printed "Calcium Hypochlorite," and in addition a label with this legend in smaller type: "Active ingredient calcium hypochlorite not less than 70% by weight. * * * Warning: Strong oxidizing agent, contact with combustible material may cause fire. Keep away from combustible material. Keep covered when not in use. Store in a cool, dry place."

8. The drums which had been received at Pier 9, North River, New York, were loaded by respondent's stevedores in accordance with a general stowage plan prepared by such stevedores in conjunction with the ship's officers.

9. Libelants have failed to sustain their burden of proof by a preponderance of the evidence that the fire was caused in fact by the drums in question, that the stowage of the drums was negligent and that such negligent stowage was the proximate cause of the fire and consequent damage complained of.

### Discussion

■ Normally a common carrier as insurer is *prima facie* liable to the owner of cargo for its non-delivery or damage in carriage. Concededly, however, in event of damage caused by fire, an exception is made. Under the Fire Statute, no shipowner is liable for loss or damage by fire "unless such fire is caused by the design or neglect of such owner." [1] The applicable provisions of the Carriage of Goods by Sea Act phrase the exception in similar language, "unless caused by the actual fault or privity of the carrier". [2] As bareboat charterer, respondent is considered an owner. [3] The principal issue in this case accordingly is whether libelants have established by a preponderance of the evidence respondent's personal fault as proximate cause of the fire and its attendant damage. The alleged personal fault of respondent was negligent stowage of the 100 drums of bleaching powder.

■ Assuming respondent's employees failed to have on board a "dangerous cargo manifest" or "list," and that such was required for the 100 drums in question as a dangerous article within the regulations of the Coast Guard, [4] it is far from establishing a cause of the fire. The facts that fire occurred in two holds of the vessel and that the 100 steel drums were stowed in one

1. 46 U.S.C.A. § 182.
2. Id. § 1304(2) (b).
3. Id. § 186.
4. 46 C.F.R. 146.06–12 to 146.06–19. See 46 U.S.C.A. § 170.

of these in proximity to wood, paper and burlap, do not establish the stowage of the drums as such cause by the requisite quantum of evidence of which libelant has the burden.[5]

Moreover, we do not believe that, measured by an external standard,[6] an appreciable risk of fire was unjustifiably created by stowing the 100 steel drums in the manner in which they were stowed aboard The Shell Bar. It may be that a sufficiently appreciable risk of combustion would result from contact of the contents of the drums in question with carbonaceous material, such as wood; but not from mere contact of the drums with such material. Notwithstanding a possibility of the oxidizing of the contents and consequent rupture of their containers, it is not unreasonable, in the light of the necessities of maritime cargo stowage, to employ wooden dunnage and battens, in contact with the steel drums. Absent proof by the requisite preponderance of evidence of the creation of such risk and of such risk as the proximate cause of the fire, it is unnecessary to consider whether any supposed fault was "personal" to the respondent.

Conclusions of Law

1. This court has jurisdiction over the parties and subject matter of this controversy.

2. Libelants have failed to sustain their burden of proof by the requisite quantum of evidence that the fire and consequent damage was proximately caused by the nature of the stowage of the cargo aboard The Shell Bar, that such stowage was negligent, and that the personal neglect of respondent was the proximate cause of the damage.

3. The libels are accordingly dismissed.

Decree accordingly.

5. See Hoskyn & Co., Inc., v. Silver Line, 2 Cir., 143 F.2d 462 at page 463; The Cabo Hatteras, D.C.S.D.N.Y., 5 F.Supp. 725 at page 729.

6. See The Germanic, 196 U.S. 589, at page 595, 596, 25 S.Ct. 317, 49 L.Ed. 610; Standard Oil Co. v. Anglo-Mexican Petroleum Corp., D.C.S.D.N.Y., 112 F.Supp. 630 at page 637.